*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* BAIRD/WHITE, Minors.

UNPUBLISHED
March 28, 2024

No. 358180
Roscommon Circuit Court
Family Division
LC No. 20-725143-NA

ON REMAND

Before: GADOLA, C.J., and SERVITTO and REDFORD, JJ.

PER CURIAM.

Our Supreme Court vacated Part III.B of our judgment and ordered this case remanded to the trial court for an evidentiary hearing[1] to determine if respondent-mother's counsel provided her ineffective assistance.[2] We remanded this case to the trial court but retained jurisdiction.[3] On remand, the trial court conducted an evidentiary hearing and issued its opinion explaining at length the evidence presented and its findings of fact and conclusions of law, denied respondent-mother's request for a new trial based on ineffective assistance of counsel, and affirmed its previous orders, including the termination of respondent-mother's parental rights to the minor child, AW.[4] We affirm.

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[2] *In re Baird/White, Minors*, ___ Mich ___; 981 NW2d 50 (2022).

[3] *In re Baird/White, Minors*, unpublished order of the Court of Appeals entered December 1, 2022, (Docket No. 358180).

[4] On return to this Court after remand, respondent-mother moved for leave to file a supplemental brief. This Court granted the motion. *In re Baird/White, Minors*, unpublished order of the Court of Appeals entered October 11, 2023 (Docket No. 358180). Respondent-mother and petitioner have each filed a supplemental brief.

## I. BACKGROUND[5]

AW was born on July 7, 2020, and a few months later sustained bruising to her lower left jaw and above her left ear. On October 28, 2020, AW's primary care physician observed these injuries which raised concern of abuse and led to an investigation in which medical professionals discovered that AW had 16 bilateral rib fractures in various stages of healing. AW's rib injuries appeared to be compression fractures which typically are nonaccidental and caused by squeezing or compression of a child's chest. Respondent-parents provided no reasonable explanation for the child's injuries.

A pediatrician and internal medicine doctor of the Center for Child Protection of the Helen DeVos Children's Hospital, Dr. Yvonne Rekeny, consulted on AW's case and reviewed the child's x-rays. Dr. Rekeny determined that AW had four broken ribs on her right lateral rib cage that were healing, two additional fractures on the posterior lateral right side that were in a more advanced stage of healing, seven other fractures on her left side in the second through eighth ribs that were healing, and three additional fractures on her posterior lateral left side that were older than the fractures on her left sixth through eighth ribs. The different stages of healing indicated that they occurred at different times. Dr. Rekeny examined AW and observed the bruising on her left jawbone. Bone surveys indicated that AW had normal bone mineralization and skeletal structure. Other testing determined that AW had no bone-fragility disorders and a genetic consult ruled out genetic disorders. Testing found no vitamin D or copper deficiency which ruled out rickets as a cause or contributor of the rib fractures. Because respondent-parents provided no credible explanation for AW's injuries, the doctors concluded that the totality of the injuries indicated nonaccidental trauma which confirmed a medical diagnosis of pediatric physical abuse.

On remand, the trial court held an evidentiary hearing that lasted close to six full days. The trial court heard the testimonies of respondent-mother's witnesses: her first attorney, Everett Ayers; her trial counsel, Richard Treusch; AW's family physician, Dr. Vincent Schultz; and as experts, a forensic pathologist, Dr. Douglas Smith; Dr. Marcus DeGraw, head of pediatrics at Detroit's Ascension Hospital; and radiologist, Dr. David Ayoub. Dr. Rekeny testified on behalf of petitioner.

Treusch testified that he received the file from Ayers[6] and after reviewing it he understood the medical issues presented and considered potential contributing factors to the rib fractures such as birth complications or AW's history of polycythemia, a disorder involving an abnormally high number of red blood cells. Treusch sought a credible expert witness, not one whose opinion testimony would be picked apart on cross-examination. He searched for a board-certified pediatric

---

[5] We incorporate by reference the factual and procedural background summarized in our previous opinion. See *In re Baird/White, Minors*, unpublished opinion of the Court of Appeals issued May 19, 2022 (Docket Nos. 358115 and 358180).

[6] Ayers testified that he had a disc of radiology images from the West Branch Hospital that he thought he got from respondent-mother. He delivered the disc to respondent-mother's appellate counsel. He also testified that he had received an e-mail with names of possible experts but he did not forward the information to Treusch when he transferred the case to him.

medical expert and consulted with a doctor who had credentials and expertise similar to Dr. Rekeny. Treusch considered the rib fracture causation issue critical to the defense and wanted to develop alternative theories for infant rib fractures. The potential expert with whom he consulted, Dr. Blake Bullock, reviewed medical records and declined the case because he did not believe he could help since he concluded that the extensive rib fractures at various stages of healing were caused by compression force. He advised Treusch that polycythemia did not serve as a contributing factor.

Treusch explained that respondent-mother had no plausible explanation for the injuries which created problems for attacking petitioner's causation theory. AW's rib fractures' various stages of healing suggested that the fractures occurred on different dates and from separate events. Treusch, therefore, did not think about challenging the age of the fractures. He discussed with respondent-mother whether other caregivers could have caused the injuries but she was adamant that she did not believe they abused AW and had no concerns or suspicions about them. Treusch testified that he would not adopt a trial strategy that his client did not want to employ. He also believed that casting blame on another caregiver could have implicated the appropriateness of the care being given AW and would have undermined the defense that no evidence suggested that anyone acted inappropriately.

Treusch admitted that he did not file a *Daubert*[7] motion to challenge Dr. Rekeny's opinions. Treusch admitted that he did not try to establish the rib fracture dates and had not consulted with a radiologist in that regard. He did not pursue retaining an expert because he lacked an alternative explanation for the rib injuries. He chose not to pursue seeking genetic testing out of concern that the results of such testing could prove counterproductive to the defense. He instead adopted the defense strategy of attacking as flawed the processes by which the doctors reached their conclusions and he focused on the best-interest factors which he concluded were very strong for respondent-mother.

Dr. Schultz testified that he fully examined AW six days after her birth and found no signs of distress or bruising. He examined AW again on July 13 and 21, 2020, during which AW exhibited no signs of distress or pain, marks or bruises. He examined AW on July 28 and August 5, 2020, for skin rashes and saw no bruises. On September 15, 2020, he performed a complete examination of AW and found no indication of pain. Dr. Schultz testified that he likely held AW in his hands by the chest and that he noted no signs of discomfort. He stated that he would expect to detect rib fractures if present at the time of an examination. He had no concerns at any time about respondent-mother's care for the child.

Dr. Smith, a board-certified anatomic and clinical pathologist with expertise in clinical pathology, anatomic pathology, and pathobiology, testified regarding rib fractures and dating them. He considered the age of the fractures the most important medical issue in AW's case because causation could be tied to the age of the fractures, perhaps some by birth trauma and some

---

[7] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993). "Under *Daubert*, the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Edry v Adelman*, 486 Mich 634, 640; 786 NW2d 567 (2010) (quotation marks and citation omitted).

by other caretakers. Dr. Smith opined that AW's rib fractures occurred at least nine weeks before October 28, 2020, and some fractures were between seven and nine weeks old at the time of her first bone scan and could have been refractures of partially healed fractures. Dr. Smith relied on an article by Dr. Thomas Sanchez to date AW's fractures according to estimated stages of healing. Dr. Smith considered AW's fractures consistent with being anywhere from 9 to 16 weeks old and in the right location for birth fractures. Dr. Smith opined that her rib fractures were between 6 to 12 weeks old. He admitted, however, that aging fractures is not an exact science. Dr. Smith testified that rib fractures were not rare but would not state that birth-related rib fractures were common. He considered AW's rib fractures consistent with birth-related injuries, but he could not state with a reasonable degree of medical certainty that they were caused by her birth.

Dr. DeGraw, board-certified in pediatrics and child-abuse pediatrics, testified that AW would have had a pain reaction to whatever caused her fib fractures, but she likely would have quickly returned to normalcy and not given a caregiver cause for concern. He testified that a child's family physician or pediatrician might not notice that a child had a fracture in some stage of healing unless the doctor had specific knowledge of the fracture's existence. He also stated that it would be typical for caregivers who did not contribute to such injuries to lack knowledge of rib fractures. He opined that it was not appropriate to suggest that a parent had failed to protect an infant when the child's medical records and medical professionals did not know that the injuries existed until after x-rays were conducted. Dr. DeGraw testified that birth trauma related rib fractures were not unusual. He opined, however, that if birth trauma caused rib fractures, they would all have occurred at the same time. Fractures in different stages of healing suggested at least two incidents of trauma.

Dr. Ayoub, board-certified in diagnostic radiology, reviewed AW's x-rays and skeletal surveys done on October 28 and 29, 2020, a CT scan performed on October 28, 2020, and a follow-up skeletal survey done on November 16, 2020. He testified that fracture healing varied from person to person based on the severity of the fracture, degree of separation, movement at the fracture site, and metabolic and nutritional conditions. Healing began with a periosteal reaction, then callus formation and remodeling. Callus and remodeling were late-stage features in fracture healing. Dr. Ayoub used the Sanchez study for infant rib fracture dating, according to stages of healing. He opined that AW's rib fractures were in late stages of healing and plausibly could be dated to birth or while in utero. Dr. Ayoub, however, could not date the fractures back that far with certainty. He considered them at least seven weeks old but admitted that aging fractures is not an exact science and the fractures could only be placed in a range of weeks. He considered it highly certain that AW's fractures were not two weeks old. Dr. Ayoub opined that, if someone caring for an infant did not see the infant fall or dropped, that person was not likely to think of fractures if the infant cried for a day or two, and likely would attribute it to colic.

Dr. Ayoub stated that a child's ribs are elastic and do not fracture until they bend a long distance. In his view, the more fractures there are, the more likely that the bones were fragile which put bone fragility on the differential diagnosis. Based on his analysis of AW's radiological images, he believed that AW had compromised bone health from an infantile form of rickets.

On cross-examination, Dr. Ayoub testified that in 17 years he consulted on over a thousand cases, testified in cases about 110 times, and wrote around 300 reports with more detailed analysis. He admitted that in all of the more detailed analysis cases he found rickets or similar metabolic

-4-

bone disorders. He asserted that in AW's case, he had a high level of certainty that she suffered from rickets. He admitted that he testified for defendants in more than 100 cases but never for the state or an agency prosecuting abuse and neglect cases. When asked if he believed that agencies like CPS worked for the sake of profit, Dr. Ayoub testified that CPS received a lot of money from foster care placement, and the federal government financially rewarded family courts in relation to termination hearings. He stated that CPS federal funding did not get used for care of children. He contended that CPS received a significant amount of money to prosecute cases, separate families, and place children into foster care.

Dr. Ayoub admitted that he could not rule out that AW's rib injuries were the result of nonaccidental trauma. He admitted that he could not say whether AW's fractured ribs were the result of accidental trauma. He admitted further that he could not state with any medical degree of certainty that AW's rib fractures were related to her having rickets. During further direct examination, Dr. Ayoub testified that he could say with a high degree of scientific certainty that AW did not have two-week-old fractures when she presented to the hospital. Dr. Ayoub also testified that rickets delayed fracture healing which would push further back the dating of AW's rib fractures.

Dr. Rekeny, board-certified in child-abuse pediatrics, testified that aging fractures is an inexact science. She aged fractures based on the progression of healing by using her experience, training, and expertise. She stated that children heal at different rates depending on their health, age, and circumstances. She agreed that the phases that the Sanchez study used were accurate descriptors of the healing process. Dr. Rekeny opined that AW's October bone study showed stage four callus formation of her lateral fractures on the outside of her ribs which indicated that her lateral fractures were between five and seven weeks old. AW's posterior lateral rib fractures of the sixth and seventh ribs appeared to be more healed and in a state of remodeling. Dr. Rekeny stated that there were several studies that had been done on the diagnostic imaging and dating of fractures, each of which had a slightly different healing progression table. A soft callus might be seen as early as 10 to 14 days and peak at 14 to 21 days, then continue into a hard callus. Dr. Rekeny testified that, even using the Sanchez model when considering AW's lateral fractures on the outside of her ribs, AW's October bone study showed stage four callus formation. According to the Sanchez article, that indicated that her lateral fractures were between five and seven weeks old. Considering AW's November bone study, her lateral fractures appeared to have progressed from stage four to stage five. The posterior lateral rib fractures of the sixth and seventh ribs appeared to be more healed and in a state of remodeling, moving from stage five into stage six. Dr. Rekeny testified that AW's vitamin D level was sufficient and in the normal range when tested at the hospital. She could not say what the level was when the fractures occurred. She also explained that, in utero, AW would have gotten enough vitamins and minerals from her mother to have normal bone development. AW's alkaline phosphatase level was normal, consistent with rib fractures that were in a state of healing. Alkaline phosphatase becomes elevated at the time of an acute injury. Alkaline phosphatase levels are not used to date healing fractures. She testified that she used her training and experience when considering fracture lines, periosteal bone formation, and callus formation to determine the age range of a fracture.

Dr. Rekeny opined that birth-related rib fractures were rare, unless the babies were very large and a difficult labor occurred. A recent study indicated that incidental rib fractures were very rare, less than 0.1 percent. AW's birth, however, had been a normal birth. Dr. Rekeny opined that

there had to be some type of significant force to cause AW's rib fractures. She agreed with Dr. DeGraw's opinion that an innocent, nonoffending caretaker might not know about a rib fracture that occurred at the hands of another caretaker. Because the fractures were in multiple stages of healing, Dr. Rekeny did not believe that they were from birth. She did not believe that they had been refractured, though the only way to determine whether a refracture existed was to follow up after seeing a fracture. However, the fracture lines and callus formation did not appear consistent with a refracture.

In the trial court's opinion and order, the court reflected upon the witnesses' testimonies. The court noted that all experts agreed that typical lateral rib fractures required significant force from squeezing or compression, infant ribs are flexible and difficult to fracture, determining the age of fractures is not a specific science, multiple ages of healing indicate two or more applications of force to cause fractures, and AW's fractures were in various stages of healing. The court observed that Dr. DeGraw and Dr. Rekeny agreed that:

1) rickets is extremely rare, would not be indicated only by rib fractures, and the disease does not occur in formula fed babies like AW;

2) genetic bone disorders are permanent and would be observed in AW;

3) the medical field considered a bruise to the face of an immobile infant a sentinel event requiring further investigation;

4) multiple fractures at various stages of healing indicate abuse of infants;

5) ribs at birth are flexible and fractures at birth are not generally limited to ribs but more commonly the clavicle or limbs;

6) infants display signs or symptoms of fractures at the time of injury, may initially display fussiness, crying, and difficulty breathing, and crepitus[8] may be palpated at or near the time of the initial fracture;

7) 16 rib fractures at various stages of healing would not be typical for birth trauma;

8) no further fractures after removal of an infant from the parent's custody (as is the case with AW) would be contraindication for metabolic bone disease.

The trial court noted that respondent-mother relied on *People v Ackley*, 497 Mich 381; 870 NW2d 858 (2015), to support her position that her trial counsel provided ineffective assistance. The court distinguished this case from *Ackley*, a case in which the defendant's counsel found an expert who told counsel that he could not assist the defendant and yet the defendant's counsel relied on that expert at trial. The trial court observed that Treusch consulted Dr. Bullock who similarly could not help respondent-mother because bone disease could not explain rib fractures. The trial court noted that, unlike the attorney in *Ackley*, Treusch decided not to use Dr. Bullock

---

[8] Bone crepitus is the sound that occurs when two fragments of a fractured bone rub together.

but chose to develop other defenses. The court observed that Treusch concluded that hiring experts would potentially be detrimental to his client's case and chose not to use experts willing to take controversial stances.

The trial court considered how Treusch developed respondent-mother's defense in consultation with her and in coordination with respondent-father and his counsel. Because respondent-mother declined to cast blame on other caregivers including respondent-father, Treusch decided to attack the validity of the limited genetic consultation and analytical process, and focus on the best-interest factors which favored respondent-mother. The trial court noted that Treusch chose not to seek genetic testing because that could have resulted in elimination of an argument without providing an explanation for the rib fractures. Treusch's trial strategy focused on demonstrating the lack of evidence of the actual cause of AW's injuries, the lack of evidence of who perpetrated the abuse, the lack of genetic testing, the defectiveness of the genetic consultation based solely on known history, and how the best-interest factors favored respondent-mother.

The trial court analyzed respondent-mother's expert's testimonies and opinions. The court concluded that AW's ribs were in various stages of healing. The court found that Dr. Smith could not date all of AW's fractures and relied on the possibility that some were older, but he could not state anything with a reasonable degree of medical certainty. Further, his testimony during cross-examination revealed that he lacked data to support many of his opinions.

The court also found Dr. Ayoub's testimony questionable because he relied on a study performed in 1936 for his rickets conclusion and admitted that the vast majority of the cases in which he rendered opinions he had opined that metabolic bone disease and mostly rickets were present despite the global rarity of such conditions. The court noted that Dr. Ayoub diagnosed rickets at a rate 722 times higher than the world average and at least 291 times higher than the highest rate considered by pediatric medical experts. The trial court also found important Dr. Ayoub's admission of bias against CPS and DHHS when he testified that he believed such agencies and their employees profited from parental terminations. The court considered such testimony the kind that respondent-mother's trial counsel did not want to present because it featured radical positions that a trier of fact could find unsupported by facts.

The trial court found that Dr. DeGraw's experience provided a legitimate foundation for his expert testimony. The court noted that Dr. DeGraw concluded that 16 rib fractures at various stages of healing did not comport with birth trauma and such rib fractures did not happen on their own but typically occurred because of squeezing and compression. Further, Dr. DeGraw's testimony explained that different stages of healing indicated two or more applications of force. The court noted that Dr. DeGraw explained that it is difficult to fracture an infant's ribs, and that bone fragility is not typical for rib fractures and would not be limited to only ribs. The court also observed that Dr. DeGraw testified that rickets is not common particularly in formula fed children. The court also found compelling Dr. DeGraw's testimony that a bruise to the face of an immobile three-to-four-month-old infant is a sentinel injury requiring full examination. The court concluded that Dr. DeGraw's testimony actually confirmed petitioner's positions, and overall provided little benefit to respondent-mother's position. The court, therefore, concluded that the testimony did not serve to establish Treusch's ineffective assistance but demonstrated that sometimes calling an expert can further harm a client's case.

The trial court noted that Dr. Rekeny based her testimony on examination of AW and her expertise in handling over 1,000 cases of child abuse. Dr. Rekeny rendered her opinions based on medical evidence. The court noted that Dr. Rekeny applied the Sanchez fracture age scale and even under that scale she concluded that the evidence indicated that the fractures were five to seven weeks old at the most. The court observed that the evidence established that AW had normal bone mineralization and 16 rib fractures at varying stages of healing, and no indication of rickets. The court considered the fact that AW had a fast and smooth birth, and no crepitus had been observed at or around the time of her birth. The trial court, therefore, concluded that nothing supported a birth-trauma theory. The court explained that, even if Dr. Smith's testimony was taken as true, Dr. Rekeny's testimony clearly outweighed his speculative hypothesis. The court also concluded that bone fragility did not apply. The court noted that the evidence established that after removal through the date of trial, AW had no further bone fractures and no further harm befell her.

The trial court then considered whether respondent-mother established that her trial counsel's performance fell below an objective standard of reasonableness by not having an expert, and if so, whether a reasonable probability existed that the case would have resulted in a different outcome. The court remarked that respondent-mother had nearly two years to find experts that could present testimony to persuade the court that the assistance of an expert would have created a reasonable probability of a different outcome, but two of the experts appeared to be biased, at best, and one seemed willing to testify regarding whatever advanced his own agenda. The court opined that those two experts would likely have caused more harm than good to respondent-mother's case. The court found Dr. DeGraw's testimony well-founded and impartial based upon expertise in the field of pediatrics and pediatric child abuse. The court concluded that his testimony, however, supported petitioner's allegations and expert's findings that AW's injuries were not accidental, not the result of genetic disorder or bone disease, and were in various stages of healing indicative of some being older than others.

The court stated that the attacks on trial counsel's trial strategy were all based on hindsight. The court noted that trial counsel had the benefit of discussions with respondent-mother and respondent-father and heeded respondent-mother's unwillingness to blame other caregivers including respondent-father which limited her defense. The court also considered significant that trial counsel had a client who had no explanation for the immobile infant's bruised face and 16 rib fractures, and she refused to consider other possible offenders. The court stated that respondent-mother failed to persuade the court with sufficient evidence that a medical defense existed establishing grounds for the court to reconsider its previous decision. The court held that trial counsel's performance did not fall below an objective standard of reasonableness and also that respondent-mother failed to establish the existence of a reasonable probability that, but for counsel's conduct, the outcome of the trial would have been different. The court stated that respondent-mother failed to meet her burden. The court explained that Dr. Smith's and Dr. Ayoub's testimonies were unsupported by clear data, facts, or accepted practices in the field, and other aspects of their testimonies likely were inadmissible under *Daubert*, and ultimately would have been harmful to respondent-mother's case. The court explained further that Dr. DeGraw's testimony also would be harmful to her case. Accordingly, the trial court denied respondent-mother's request for a new trial based on ineffective assistance and it affirmed its previous decision to terminate her parental rights. Respondent-mother now appeals.

## II. STANDARD OF REVIEW

Whether counsel provided ineffective assistance generally presents a mixed question of fact and constitutional law. *In re Mota*, 334 Mich App 300, 318; 964 NW2d 881 (2020). We review a lower court's factual determinations for clear error and decisions regarding questions of law de novo. *Id.* "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *In re Ellis*, 294 Mich App 30, 33; 817 NW2d 111 (2011).

## III. ANALYSIS

Respondent-mother argues that her trial counsel provided ineffective assistance by failing to adequately investigate medical issues, retain and use a medical expert, recognize critical issues in the case, and understand the controlling law. We disagree.

To establish ineffective assistance of counsel, a respondent must show that: (1) counsel's performance fell below an objective standard of reasonableness, and (2) a reasonable probability exists that but for the deficient performance the outcome of the proceeding would have been different. *In re Martin*, 316 Mich App 73, 85; 896 NW2d 452 (2016); see also *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012) (citations omitted). "[A respondent] must 'overcome the strong presumption that counsel's performance was born from a sound trial strategy.' " *People v Ackley*, 497 Mich 381, 388; 870 NW2d 858 (2015), citing *Trakhtenberg*, 493 Mich at 52. A respondent "has the burden of establishing the factual predicate for [her] claim of ineffective assistance of counsel." *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). An attorney's decision regarding witnesses is a matter of trial strategy, and a party claiming ineffective assistance must overcome the presumption that counsel employed effective trial strategy. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). The failure to call a witness may constitute ineffective assistance of counsel where it deprives a party of a substantial defense. *Id.* "This Court will not substitute its judgment for that of a respondent's counsel in matters of trial strategy." *In re Trowbridge*, 155 Mich App 785, 787; 401 NW2d 65 (1986).

Generally, "[d]ecisions regarding what evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy." *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008), lv den 482 Mich 1033 (2008). This Court "will not second-guess counsel on matters of trial strategy, nor we will assess counsel's competence with the benefit of hindsight." *Id.* This Court gives defense counsel wide discretion in matters of trial strategy because counsel may be required to take calculated risks to win a case. *People v Pickens*, 446 Mich 298, 325; 521 NW2d 797 (1994). "A particular strategy does not constitute ineffective assistance of counsel simply because it does not work." *People v Matuszak*, 263 Mich App 42, 61; 687 NW2d 342 (2004).

However, "[c]ounsel always retains the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Trakhtenberg*, 493 Mich at 52 (quotation marks and citation omitted). "[A] sound defense strategy cannot follow an incomplete investigation of the case when the decision to forgo further investigation was not supported by reasonable professional judgment." *Id.* at 55. An attorney's decision to select an expert witness must be made after thoroughly investigating the law and facts of the case. *Ackley*,

497 Mich at 390. A failure on the part of counsel to research the legal and factual issues related to a case is not objectively reasonable. See *id*. Although counsel is not required "to shop for experts until finding one who will offer favorable testimony," it is not reasonable for counsel to ignore an expert's advice to secure a different expert. *Id*. at 392.

Respondent-mother argues that her trial counsel failed to adequately investigate her case or understand *In re Ellis*, 294 Mich App 31; 817 NW2d 111 (2011), a similar case in which the parents of an infant with severe physical injuries in different stages of healing were unable to explain them. The child's injuries appeared consistent with forceful shaking and squeezing, and nothing indicated that the child's injuries were accidental, related to genetic problems, or related to childbirth. *Id*. at 32. The fact that the injuries were in different stages of healing showed that the child had suffered multiple instances of abuse over a prolonged period. *Id*. at 35. The respondents argued that it was impossible to determine which of them had abused the child. *Id*. at 33. This Court explained, "When there is severe injury to an infant, it does not matter whether respondents committed the abuse at all, because under these circumstances there was clear and convincing evidence that they did not provide proper care." *Id*. Ultimately, this Court held "that termination of parental rights under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (j), and (k)(*iii*) is permissible even in the absence of definitive evidence regarding the identity of the perpetrator when the evidence does show that the respondent or respondents must have either caused or failed to prevent the child's injuries." *Id*. at 35-36.

In this case, the record does not establish that respondent-mother's trial counsel did not know of *Ellis* or its legal implications. Treusch knew of the legal principle that petitioner could prove that a parent failed to protect a child by ruling out other caregivers and that, when an infant is seriously injured, petitioner does not have to prove which parent injured the child. Further, Treusch knew that petitioner took that position in respondent-mother's case. The record, therefore, does not support respondent-mother's contention that Treusch inadequately investigated the legal issues surrounding this case. Moreover, as the trial court discerned, Treusch developed a trial strategy to challenge petitioner's case to the extent reasonably possible and focused on the best-interest factor analysis which favored respondent-mother.[9] Therefore, we are not definitely and firmly convinced that the trial court made a mistake when it found that respondent-mother's trial counsel appropriately investigated and understood the case and worked to develop an appropriate defense strategy.

Respecting respondent-mother's assertion that Treusch provided ineffective assistance by not securing an expert to testify regarding the timing of AW's injuries, the record reflects that respondent-mother's proffered experts' testimonies did not demonstrate Treusch's substandard performance but revealed the reasonableness of his decision not to retain one or more experts

---

[9] Respondent-mother argues that it was objectively unreasonable for Treusch to proceed without having the radiology disc that Ayers had in his files and that this establishes that counsel engaged in insufficient investigation. The record indicates that Treusch did not know that the discs existed. Even if the disc was pertinent to dating the fractures, as discussed herein, we are not convinced that it was unreasonable for Treusch to choose a different trial strategy and not focus on the dates of the fractures.

-10-

because of their significant vulnerability to credibility challenges and the potential detrimental effects on respondent-mother's case. Treusch adequately investigated and inquired of Dr. Bullock, a reputable medical practitioner, who clarified the medical issues presented and the difficulties the case presented because of the numerous rib fractures at various stages of healing. Treusch consulted with Dr. Bullock who helped him understand causation issues, including specifically whether AW's polycythemia could have caused or contributed to her fractures. Because these were the same issues that petitioner's expert had identified, Treusch and respondent-mother discussed "pivoting the strategy" to attack the process that formed Dr. Rekeny's opinion. Treusch also decided to focus on respondent-mother's very strong best-interest factors and he chose not to obtain genetic testing for AW because it could disprove one aspect of respondent-mother's theory of the case. Treusch reasonably concluded, based on the evidence, that dating the fractures provided no real benefit to the defense. The experts' testimonies at the *Ginther* hearing uniformly established that dating infant rib fractures is inexact and not a reliable scientific methodology that could have established that AW suffered her fractures at birth. Dr. Smith's and Dr. Ayoub's testimonies were speculative and not well-founded on the facts in evidence. Moreover, their testimonies did not undercut Dr. Rekeny's analysis and expert opinion; and Dr. DeGraw's testimony actually paralleled Dr. Rekeny's medical conclusions and supported petitioner's position that AW's injuries originated from child abuse. Further, Treusch cannot be faulted for discerning that establishing the time frame of the injuries under the facts presented in this case would not benefit respondent-mother unless she would willingly pursue the strategy that one of the other caregivers may have injured AW. Because respondent-mother adamantly refused to do so, Treusch appropriately worked with his client to develop and present a different trial strategy.

Treusch also understood that blaming another caregiver could potentially backfire and harm respondent-mother's defense by implicating the appropriateness of the care and the decision to entrust AW's care to another who abused the child. The record indicates that Treusch made a reasonable decision to attempt to show that petitioner could not prove that anyone acted inappropriately, suggest that a genetic explanation existed for what happened, and to stress the best-interest factors which he believed would lead to the highest likelihood of success for his client under the circumstances presented in this case. We are not convinced that the trial court made a mistake by concluding that respondent-mother failed to meet her burden of establishing that Treusch adopted an objectively unreasonable trial strategy.

The record demonstrates that Treusch faced a difficult case with numerous risks to his client depending on the defense presented. The evidence indicated physical abuse on more than one occasion and did not support adoption of speculative and factually unsupported theories like in utero or birth trauma, infant rickets, or bone fragility. Under the facts presented in this case, the dating of the fractures may have been relevant if respondent-mother agreed to blame other caregivers, but because she refused to do so, the timing of the fractures would not have assisted her defense. Dr. Smith and Dr. Ayoub admitted their respective inability to establish with any degree of medical certainty the timing of AW's rib fractures. Their testimonies revealed the weaknesses of their speculative theories which would not have assisted respondent-mother's defense because the broad date ranges they relied on for the occurrence of AW's rib injuries encompassed a postbirth period and could not rule out that they occurred on separate dates. The strategy that Treusch adopted in consultation with his client was not the result of unsound professional judgment. Therefore, we are not definitely and firmly convinced that the trial court

made a mistake when it found that respondent-mother's trial counsel engaged in a reasonable trial strategy.

Notably, respondent-mother focuses all of her attention and arguments on rib fracture analysis and dating to posit that Treusch provided her ineffective assistance. Such analysis, however, disregards the fact that AW, an immobile infant, presented with a bruised jaw and a bruise above her ear that led to further investigation that determined the presence of 16 rib fractures in various stages of healing. The rib fracture evidence suggests either fractures at one time that were later refractured, or the multiple fractures occurred during different fracture events. Dr. Rekeny testified that the nature of the healing ribs ruled out refracture. Respondent-parents had no explanation for AW's injuries. The record indicates that respondent-parents offered changing stories regarding the causation of the rib fractures and head injuries that proved factually insupportable. At the *Ginther* hearing, respondent-mother focused on Treusch's not calling an expert to opine on the age of the fractured ribs and whether he should have retained and presented expert testimony on that issue. The rib fracture dating, however, provides no explanation for the face/head traumas, neither of which rationally could be attributed to birth trauma or bone-related issues. Respondent-mother's arguments ignore that Treusch needed to consider all of the infant's injuries, the ribs and the head injuries, for development of respondent-mother's defense. Exclusive focus on the rib fractures, as respondent-mother argues, fails to establish deficient performance because it fails to recognize that such defense could not explain away AW's more recent and visually observable injuries. Taking those injuries into account reveals that Treusch actually developed a reasonable defense strategy to redirect attention from the injuries and the statutory grounds for termination to focus on the best-interest factors and how they favored respondent-mother. The totality of AW's injuries, regardless of the cause or demonstration of who perpetrated it against AW, necessitated the development and execution of just such a defense strategy as that which Treusch engaged. Had Treusch focused on AW's rib fractures and attempted to present expert testimony regarding alternative causation and timing of those injuries, such strategy would likely have been unsuccessful because of indefiniteness and would have fallen short of addressing the more obvious recent head injuries. The record reflects that the trial court discerned this failure in respondent-mother's arguments regarding ineffective assistance. Thus, even if we considered Treusch's performance deficient in relation to the rib fractures and we concluded that Treusch should have presented testimony of experts like those who testified at the *Ginther* hearing, we remain unconvinced that more probably than not, but for counsel's performance in that regard, a different outcome would have resulted.

The "absence of definitive evidence regarding the identity of the perpetrator" is not dispositive when the evidence demonstrates that the respondents caused or failed to prevent the injuries. *In re Ellis*, 294 Mich App at 35-36. In such circumstances, termination is appropriate under MCL 712A.19b(3)(b)(*i*) or (*ii*), and this Court will not reverse merely because the evidence is unclear as to who actually caused the injury. *Id*. Although an innocent caretaker likely might not notice the rib injuries—which in infants is not necessarily revealed by the infant's behavior— a parent must provide adequate care and custody of a minor child to prevent head injuries such as those sustained by AW. Further, a caretaker of ordinary competency should notice facial and head injuries and take steps to protect the child. The fact that the face and head injuries occurred suggests a lack of prevention of injuries or disregard for the child's safety when able to do so. Although respondent-mother could claim that she had no opportunity to protect AW regarding her rib injuries because they were unknown and undetectable, such claim cannot apply regarding

AW's face and head injuries. Trial counsel's statement in closing argument that a statutory ground may have existed under the failure to protect rationale when viewed in context does not appear to have been an outright concession but a lead-in to his reasoned argument that, regardless, the trial court should focus on the best-interest factors that favored respondent-mother and against termination. Treusch did not provide ineffective assistance by redirecting the focus from the injuries on other aspects of the case for respondent-mother's defense.

The evidence establishes that AW suffered physical abuse and that respondent-mother, a parent who had opportunity to prevent it, did not do so, and a reasonable likelihood existed that the child will suffer injury or abuse in the foreseeable future if placed in respondent-mother's home. The evidence does not establish that Treusch performed deficiently; and even if we concluded that respondent-mother could prove that he did, we are not persuaded that but for Treusch's performance the outcome would have been different. Respondent-mother has failed to establish that evidence could have been presented on her behalf at the termination hearing regarding the timing of the rib fractures that would have led to a different outcome. Thus, she has failed to establish the factual predicate for her claim of ineffective assistance of counsel. Moreover, given the evidence supporting termination of respondent-mother's parental rights to AW, even if she had presented evidence at the termination hearing like that offered at the *Ginther* hearing, such would not have resulted in a different outcome. The trial court, therefore, did not err by denying respondent-mother's request for a new trial, nor did it err by affirming its decision to terminate her parental rights to AW.

Affirmed.

/s/ Michael F. Gadola
/s/ Deborah A. Servitto
/s/ James Robert Redford